UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JILL CHERYL YARNAL,

  Plaintiff,

v.

NANCY A. BERRYHILL,

  Defendant.

Case No. 17-cv-06795-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 14, 21

## I.   INTRODUCTION

Plaintiff Jill Yarnal seeks review of the final decision of Defendant Nancy Berryhill, Acting Commissioner of the Social Security Administration (the "Commissioner"), denying her applications for disability insurance and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act.  For the reasons stated below, the Court GRANTS Yarnal's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, REVERSES the decision of the Commissioner and REMANDS the case to the Social Security Administration for further proceedings.[1]

## II.   BACKGROUND

### A.   Factual Background

#### 1.  Yarnal's Education and Employment History

Yarnal was born on April 7, 1954.  Administrative Record ("AR") at 105, 234.  In May 1976, Yarnal graduated from college with a degree in home economics.  *Id.* at 56, 248.  Yarnal worked at a bridal shop from 2005 to June 2012, when increased pain in her knees  made it

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

difficult for her to perform the physical requirements of the job and her position was eliminated because the business was downsized. *Id.* at 247–48, 263, 274, 343. After Yarnal's job ended, her "knees continued to deteriorate" and she could not find a job to accommodate her restrictions. *Id.* at 247.

Prior to working in the bridal store, between 1985 to 2002, Yarnal worked in a business she co-owned with her husband involving restoring furniture with fire or water damage, including picking furniture up from customers and returning it to them when the furniture had been restored. *See id.* at 248, 273, 276, 343. Between February 2003 and December 2004, Yarnal worked as a "consultant" to help set up a home goods and furniture retail store. *See id.* at 275, 343. In this capacity, Yarnal engaged in manual labor like painting, moving furniture, carrying boxes, and stocking shelves, as well as sales and administrative tasks such as buying and displaying merchandise, banking and bookkeeping, opening and closing the store, and waiting on customers. *Id.* at 275, 343.

### 2. Yarnal's Medical History

Yarnal alleges that she is limited in her ability to work by extreme knee pain caused by stage 3-4 chondromalacia on the medial femoral condyle, degenerative osteoarthritis of bilateral knees, derangement of meniscus of the right knee, and restless leg syndrome. *Id.* at 247, 252–53, 255, 337, 345. The record also reflects that Yarnal has suffered from peripheral venous insufficiency, prediabetes, heart murmur, hypothyroidism, depression, osteoarthritis in hands, occasional GERD, spinal disc space narrowing, and shoulder injuries, including frozen shoulder, a left rotator cuff tear, and calcific tendonitis. *Id.* at 251, 253, 583, 1043–46. Yarnal's medical history includes surgery for carpal tunnel syndrome, varicose veins, and removal of thyroid nodules, and she has had knee and shoulder arthroscopies. *Id.* at 847, 1043–46. Yarnal's doctors have prescribed medications for pain, inflammation, restless leg syndrome, and hypothyroidism, including carbidopa, clonazepam, hydrocodone (also referred to in the record as "Norco"), indomethacin, methadone, and levothyroxine. *Id.* at 1258–69; *see also id.* at 250, 315, 322, 346.

In 2013, Yarnal received treatment from Dr. Rumka Singh, M.D., her primary care physician, and was also referred to several specialists for her legs, knees, shoulder, hands, and

2

depression, as discussed further below. Dr. Singh treated Yarnal from February 2013 to approximately April 2015.[2] Dr. Pirouz Fakhraei, M.D. became Yarnal's primary care physician around October 2015. The Court summarizes Yarnal's relevant medical treatment below.

  a. Yarnal's Knee Pain

Nurse Practitioner Heidi Wurzburg evaluated Yarnal on October 5, 2011, for bilateral knee pain described as "sharp and stabbing in nature when kneeling w[ith] an aching along the medial joint." *Id.* at 373–80. Wurzburg opined that the pain was likely caused by bursitis and a medial collateral ligament strain. *Id.* at 376. She prescribed indomethacin and Norco to manage the pain and inflammation and recommended light exercise on a stationary bicycle. *Id.* at 378–79, 390.

Dr. Singh saw Yarnal on February 25, 2013. *Id.* at 504. At the evaluation, Dr. Singh noted bilateral mild swelling of Yarnal's knees and increased pain at the extremes of flexion and extension. *Id.* at 504. She ordered an x-ray of Yarnal's knees, *id.* at 509, which was conducted by Dr. Grant Robert Lindee, M.D., on March 22, 2013. *Id.* at 513–15. Dr. Lindee found "hypertrophic spurring involv[ing] both knees, with minimal medial compartmental narrowing bilaterally," but he did not find fractures or effusions in Yarnal's knees. *Id.* at 513–15. Dr. Lindee's records indicate that Yarnal's soft tissues were unremarkable at the time of this x-ray. *Id.* at 513–15.

On March 16, 2013, Yarnal aggravated her right knee pain when she stepped off a curb and injured her knee. *Id.* at 522. She saw Dr. Singh on March 26, 2013, who reported that she had right knee swelling, mild TTP over the medial joint line, and increased pain on flexion more than 90 degrees, although Yarnal was able to extend her knee. *Id.* at 522. Dr. Singh assessed the injury as a meniscus tear in Yarnal's right knee and prescribed a brace, ace bandage, and regime of ice and elevation. *Id.* at 523. When this regime did not alleviate Yarnal's pain, Dr. Singh referred Yarnal for an MRI. *Id.* at 524. Dr. Alan Larocque conducted the MRI on April 10, 2013. *Id.* at 527–31. Based on the MRI, he concluded that Yarnal had a flap tear on the lateral meniscus of her

---

[2] In her Disability Report, dated May 22, 2014, Yarnal states that her last visit to Dr. Singh was in December 2013, *see* AR 253. Subsequent treatment records indicate Dr. Singh continued to see Yarnal until at least April 2015. *See, e.g.*, *id.* at 1184–92, 1289.

right knee, as well as a moderate size knee joint effusion and subcortical focal bone marrow edema.  *Id.* at 527–31.

Yarnal next saw Dr. Harvey Bruce Moskovitz, M.D., on April 15, 2013.  *Id.* at 537–39. Dr. Moskovitz noted that Yarnal had tried several different medications for her pain with little effect.  *Id.* at 538.  He opined that Yarnal had osteoarthritis in her knees aggravated by obesity with a possible lateral meniscal tear.  *Id.* at 538.  On June 11, 2013, Dr. Moskovitz, performed a right knee arthroscopy with partial medial and lateral meniscectomies and debridement of articular cartilage.  *Id.* at 569, 574, 623, 1262–69; *see also Id.* at 252, 254.  On April 16, 2013, Dr. Moskovitz noted prior to surgery that the "X-ray show[ed] mild medial narrowing," and the "MRI suggested [a] lateral meniscal tear."  *Id.* at 581–82.  Post-surgery, Dr. Moskovitz diagnosed Yarnal with grade 3 torn right medial meniscus, torn lateral meniscus, and chondromalacia of the medial femoral condyle and patellofemoral joint.  *Id.* at 623; *see also id.* at 673, 675.  Yarnal alleges that Dr. Moskovitz told her after surgery that both knees were at "a stage 3+" and would need to be replaced in one to four years.  *Id.* at 252.  In an internal Kaiser message on November 18, 2013, Dr. Moskovitz stated to Yarnal that although "[i]t is hard to predict when and if someone gets a [knee] replacement," he "would suspect at least 1-2 y[ea]rs" for Yarnal.  *Id.* at 742.  Physician Assistant Ann Spire Bruner-Welch, P.A., also described Yarnal's injury as a grade 3 torn medial and lateral menisci in her notes from a post-operative knee exam she performed on June 21, 2013.  *See id.* 672–76.  Dr. Moskovitz reviewed and agreed with Bruner-Welch's note. *See id.* at 673.

At Yarnal's one-month follow-up on July 12, 2013, Dr. Moskowitz noted that Yarnal's knee pain was improving, that she maintained motion, her wounds had healed, and she had stable ligaments.  *Id.* at 681.  However, at Yarnal's six-month follow-up, on December 20, 2013, Dr. Moskowitz noted that Yarnal continued to have medial pain in her right knee and "grade 3 changes of medial and Patellofemoral compartment."  *Id.* at 781.  Dr. Moskowitz stated that Yarnal's "[c]urrent restrictions include no prolonged standing, no lifting greater than 10 pounds, [and] no squatting."  *Id.* at 781.  Similarly, Dr. Singh's notes from an exam she performed a few days earlier, on December 17, 2013, reflect that Yarnal "continue[d] to have swelling and pain in

[her] right knee [six months] after the [arthroscopy] surgery. She feels she is disabled due to this and wants to consider knee surgery and disability paperwork." *Id.* at 759–60.

Dr. Moskowitz retired the following year. *Id.* at 989. Yarnal then asked Dr. John Gansel, M.D., the treating physician for her shoulder, to take over as her orthopedic physician for her knees as well, and Dr. Gansel agreed. *Id.* at 989. The record reflects that Yarnal asked Dr. Gansel to explain a note by Dr. Moskovitz stating that her knees were at "stage 3+" and whether Dr. Gansel agreed with Dr. Moskovitz's assessment. AR 994. Dr. Gansel responded:

> Stage 3+ knee probably refers to the degree of chondromalacea (articular cartilage wear) in your knee. [I]n Dr. Moskovitz's operative note in your chart he documented Grade 3 chondromalacea on the medial femoral condyle. The scale is from 0 to 4 with 0 being normal cartilage, and 4 being exposed bone in your knee. There is no time frame that can be determined from "Stage 3" to when you have your knee replaced. The best way to follow your arthritis is with repeat standing x-rays. But you have to be ready to have your knee replaced before it would be indicated . . . it is pretty obvious when it is finally bone-on-bone (corresponding to grade 4 chondromalacea" on the femur and tibia)[.]

*Id.* at 994. Two days later, on May 8, 2014, Dr. Gansel ordered x-rays for Yarnal's degenerative knee arthritis to assess the remaining joint space between her femur and tibia. *Id.* at 997.

Dr. Singh saw Yarnal for medication management on January 21, 2015 and discussed the risks of taking hydrocodone for chronic knee pain in addition to methadone and clonazepam for her restless leg syndrome. *Id.* at 1113; *see also Id.* at 1000-02 (discussion of the same between Yarnal and Dr. Sarah Hu Gong). At this appointment, Yarnal stated that she did not want to change her medication regime and Dr. Singh encouraged her to follow up with Dr. Gansel for another knee x-ray. *Id.* at 1113.

Dr. Daniel Penn, M.D., performed an x-ray of Yarnal's knees on March 23, 2015. *Id.* at 1145. Dr. Penn found bilateral and symmetric tricompartmental osteoarthritis and a left knee joint effusion. *Id.* at 1145. On March 30, 2015, Dr. Gansel conducted a follow-up evaluation and compared Yarnal's knee x-rays from 2015 and 2013. *Id.* at 1170–73. Dr. Gansel stated that Yarnal's arthritis had progressed in both knees mildly, that she had medial joint narrowing on the right and patellofemoral disease on the left, that her arthritis had not yet progressed to the point of needing knee replacement and to recheck as necessary. *Id.* at 1170–71.

At the request of the Department of Social Services, on August 20, 2014, Dr. Soheila Benrazavi, M.D., saw Yarnal to perform an internal medicine evaluation. *Id.* at 1014–18. Dr. Benrazavi noted that her examination of Yarnal's knees was "limited by morbid obesity and pannus that overlies both knees," *Id.* at 1016, but that much to her "surprise," Yarnal's "range of motion of the bilateral knees was only very mildly diminished," *Id.* at 1017. Dr. Benrzavi found that Yarnal's right knee was slightly limited in range of motion but found no evidence of instability or swelling. *Id.* at 1017. Dr. Benrazavi opined that Yarnal was able to stand, walk, and sit for six hours out of an eight-hour workday due to the mild osteoarthritis in her right knee, but that Yarnal was limited to occasional squatting and climbing. *Id.* at 1017–18.

One year later, on September 1, 2015, Yarnal saw orthopedic surgeon Dr. Andrew Burt, M.D. for an orthopedic social security disability evaluation. *Id.* at 1029–36. Dr. Burt stated that he reviewed Yarnal's "massive Kaiser Permanente file" and conducted a physical examination. *Id.* at 1031. Dr. Burt diagnosed Yarnal with peripheral venous insufficiency in her legs and end stage degenerative osteoarthritis in both knees. *Id.* at 1034. He also noted her morbid obesity. *Id.* at 1034. Dr. Burt additionally found that Yarnal had joint effusion at both knees, a Baker's cyst, varus deformity, and retropatellar crepitus. *Id.* at 1035.

Based on his examination and Yarnal's subjective complaints, Dr. Burt opined that Yarnal had "a profound level of orthopedic disability due to her knee joint condition alone on both sides." *Id.* at 1035–36. Dr. Burt opined that Yarnal "qualifies for benefits under Listing of Impairments, Section 1.1, Category of Musculoskeletal Impairments, Paragraph 1.02." *Id.* at 1035. Explaining that opinion, Dr. Burt reported:

> There is major dysfunction of major weight bearing joints (knees) at both lower extremities characterized by chronic joint pain, stiffness, limitation of motion, and radiographic findings of advanced (end stage) osteoarthritis medially and laterally at both knees. There is evidence on physical examination of vascular insufficiency. She has had vein stripping on at least two occasions with recurrence of the insufficiency due to morbid obesity.

*Id.* at 1035. Dr. Burt found that Yarnal's "degenerative condition at both knees results in [an] inability to ambulate effectively as defined in Section 1.020B2b." *Id.* at 1036. Dr. Burt also found that she has a "limited tolerance for sitting [a]s the result of chronic knee pain and edema

6

aggravated by dependency." *Id.* at 1036.

Dr. Burt concluded that Yarnal "cannot return to her job in retail because of the standing and walking required." *Id.* at 1035. Dr. Burt explained that Yarnal "cannot tolerate standing and walking for a full two hours," and at times she has to lie down or recline "to relieve the pressure across her lower extremities." *Id.* at 1036; *see also id.* at 1039 (opining that Yarnal can stand for ten minutes at one time and less than two hours total, and that she needs a job that permits shifting positions at will as well as unscheduled breaks). Dr. Burt added that "[h]er job also required squatting, bending and lifting," and "[s]he can no longer tolerate those activities." *Id.* at 1035. He opined that Yarnal can never crouch, squat, or climb ladders or stairs, that she can rarely stoop (bend), and that she can occasionally twist. *Id.* at 1040. Dr. Burt further opined that Yarnal is "unable to work eight hours a day, five days a week on a continuous basis" because in an eight-hour workday, she "is unable to sit for six hours" due to "chronic knee pain and edema aggravated by dependency." *Id.* at 1036; *see also Id.* at 1039 (opining that Yarnal can only sit for thirty minutes at one time and four hours total). Dr. Burt stated that "[m]aximum medical improvement has been achieved short of an aggressive weight loss program and total knee replacement" and Yarnal's "orthopedic disability at both lower extremities is permanent and stable." *Id.* at 1035.

### b. Yarnal's Restless Leg Syndrome

Neurologist Dr. Sarah Hu Gong, M.D., treated Yarnal for her restless leg syndrome beginning in 2012. Dr. Gong evaluated Yarnal on February 17, 2012 and confirmed her childhood diagnosis and extensive family history of restless leg syndrome. *Id.* at 426–27; *id.* at 479. Dr. Gong recommended the continued use of prescription medications clonazepam, methadone, and sinemet as treatment. *Id.* at 426–27; 479. At a subsequent exam on February 9, 2016, Dr. Gong noted that Yarnal felt that Sinemet was more addictive than the other medications because it relieved her pain for shorter and shorter periods of time. *Id.* at 1222. Yarnal also reported that she was getting up four times a night and was not sleeping because of her knee pain. *Id.* at 1222. Dr. Gong prescribed gabapentin and recommended an increase in her methadone dose if the new medication was not effective. *Id.* at 1223.

c.  Yarnal's Left Shoulder and Spine

In May 2013, "in an attempt to protect [her] knee when it gave out, [Yarnal] wrenched [her] left shoulder." *Id.* at 550.  On September 3, 2013, Dr. Singh evaluated Yarnal's left shoulder x-ray and found calcium hydroxyapatite deposition within her supraspinatus tendon, but no additional bone or joint abnormality. *Id.* at 697–700.  He opined that tendonitis or bursitis were the likely cause of her shoulder pain and recommended physical therapy or a possible steroid injection. *Id.* at 697.

When Yarnal saw Dr. Moskovitz for her post-operative knee exam on June 21, 2013 (discussed above), he noted that Yarnal had a left shoulder impingement that could be a rotator cuff tear. *Id.* at 673–74.  On September 5, 2013, Dr. Singh gave Yarnal a cortisone injection in her left shoulder joint. *Id.* at 709, 715.  On September 9, 2013, physical therapist Sharon Barbee diagnosed Yarnal with a shoulder impingement syndrome that might require surgery. *Id.* at 714

On September 10, 2013, Dr. Clifford Franklin Sweet performed an MRI on Yarnal's left shoulder and diagnosed her with a full-thickness tear of the rotator cuff, specifically, the supraspinatus tendon, anterior fibers. *Id.* at 721–22; *see also id.* at 725.  Dr. Sweet also found mild acromioclavicaular urgency and mild thickening of the coracoacromial ligament without significant narrowing of the supraspinatus outlet. *Id.* at 722.  Dr. Singh subsequently referred Yarnal to orthopedics for her shoulder. *Id.* at 727.

On September 17, 2013, Dr. Matthew McElvany saw Yarnal and diagnosed her pain as left frozen shoulder. *Id.* at 733–34.  Dr. McElvany recommended exercises to improve the range of motion in her shoulder and reduce her pain. *Id.* at 734.

On December 17, 2013, Yarnal saw Dr. Singh for a disability evaluation. *Id.* at 759.  In the evaluation, Dr. Singh noted that Yarnal had a rotator cuff tear and neck pain down her left shoulder. *Id.* at 759–60.  This same day, Dr. Dung My Thi Do, M.D., evaluated Yarnal's spine to rule out a possible fracture. *Id.* at 765.  Dr. Do found that Yarnal's bones were "normally mineralized" and her vertebral alignment was also normal. *Id.* at 765.  He found mild disc space narrowing throughout Yarnal's spine, including mild neural foraminal narrowing on the right side at C4-5 and C5-8 and on the left side at C5-6. *Id.* at 765.

The following day, Dr. Helen Shen Yee, M.D. evaluated Yarnal for her neck and shoulder pain. *Id.* at 773–75. Dr. Helen Yee recorded Yarnal's right and left arms at full strength, but with limited range of motion due to pain and tightness. *Id.* at 774. Dr. Helen Yee assessed Yarnal's left arm pain as caused by her shoulder injuries (the rotator cuff tear and adhesive capsulitis) and her trapezius pain from compensatory use given the shoulder pain. *Id.* at 775. She did not find Yarnal's presentation to be consistent with a cervical radiculopathy. *Id.*

On December 20, 2013, Yarnal saw Dr. McElvany for a follow-up on her left shoulder pain. *Id.* at 783–86. Dr. McElvany examined Yarnal and stated that "[s]he clearly has significant pain in the shoulder." *Id.* at 784. He opined based on his exam, Dr. Helen Yee's negative findings for radiculopathy, and Yarnal's history of restless leg syndrome and hypersensitivity, that there may be "a difference in the way [Yarnal's] nerves regularly work compared to the general population." *Id.* at 784–85. However, Dr. McElvany cautioned that this opinion could not be assessed objectively and that he believed Yarnal had "many risk factors" that may result in less positive responses to treatment than the average patient. *Id.* at 784–85. Dr. McElvany stated that his "key finding" was that he did not have an easy fix for Yarnal's shoulder problem and that he was hesitant to recommend rotator cuff repair because of the risk of making her shoulder stiffer and worse off. *Id.* at 785. He treated Yarnal with a series of injections and recommended further home exercises. *Id.* at 785.

On February 6, 2014, Yarnal saw Dr. John Gansel, M.D. for a second opinion on her shoulder injuries. *Id.* at 795–98, 846. On March 14, 2014, Dr. Gansel performed shoulder surgery on Yarnal. *Id.* at 834, 927–28; *see also Id.* at 251, 254. Post-surgery, Dr. Gansel diagnosed Yarnal with left shoulder calcific tendinitis. *Id.* at 927. Dr. Gansel saw Yarnal for post-surgery follow-ups on March 18, 2014, *id.* at 967–68, and on April 3, 2014, *id.* at 974–75. By June 12, 2014, after several months of physical therapy, physical therapist Nancy Conway, assessed that Yarnal had "mild residual stiffness and weakness" and was "able to reach overhead with mild limit." *Id.* at 1002.

Two months later, on August 20, 2014, Dr. Soheila Benrazavi, M.D. saw Yarnal to perform an internal medicine evaluation at the request of the Department of Social Services, as

9

noted above. *Id.* at 1014–18. With respect to Yarnal's shoulders, Dr. Benrazavi opined that Yarnal was "able to lift and carry 50 pounds occasionally, and 25 pounds frequently." *Id.* at 1017.

### d. Yarnal's Hands & Trigger Fingers

As previously noted, Yarnal saw physician assistant Bruner-Welch and Dr. Moskovitz for her post-operative knee exam on June 21, 2013. At this time, Dr. Moskovitz also examined Yarnal's hands and found that she had trigger fingers in both hands. *Id.* at 673–74.

Dr. Singh ordered x-rays of Yarnal's hands on March 19, 2015 based on Yarnal's report that she had been told she had arthritis in her hands and that it had "been killing [her] lately." *Id.* at 1141. Dr. Daniel Penn, M.D. performed the x-rays on March 23, 2015 and found osteoarthritis affecting the joints of each of Yarnal's hands. *Id.* at 1144–45. Dr. Singh reported this osteoarthritis finding to Yarnal when she saw her for obesity counseling and a gastric bypass evaluation on March 24, 2015. *Id.* at 1157–59.

### B. Legal Background: Five-Step Analysis for Determining Physical Disability

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the Administrative Law Judge ("ALJ") considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If she is, the ALJ must find that she is not disabled. *Id.* If she is not engaged in substantial gainful activity, the ALJ continues the analysis. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable

physical or mental impairment," or combination of such impairments, which meets the regulations' twelve-month duration requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, she is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At step four, the ALJ considers the claimant's residual functional capacity ("RFC") in light of her impairments and whether she can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (citing 20 C.F.R. § 404.1560(b)). If she can perform past relevant work, she is not disabled. *Id.* If she cannot perform past relevant work, the ALJ proceeds to the final step. *See id.*

At step five, the burden shifts to the Commissioner to demonstrate that the claimant, in light of her impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R. § 404.1520(a)(4)(v). If the Commissioner meets this burden, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that she can perform. *Id.*

## C.    Procedural History

Yarnal applied for Social Security Disability Insurance Benefits under Titles II and XVI of the Social Security Act on April 30, 2014. AR at 234–35. She alleged that extreme knee pain from stage 3+ chondromalacia on the medial femoral condyle in both knees, as well as a torn meniscus in her right knee, and restless leg syndrome, rendered her disabled on June 9, 2012. *Id.*

at 247, 252, 255.  The Social Security Administration ("SSA") denied these applications initially and on reconsideration.  *Id.* at 134–35 (denial); 140, 142–43 (reconsideration).  An ALJ held a hearing at Yarnal's request and, as described below, determined that she was not disabled.  *Id.* at 17–104, 148–72.  Yarnal requested review of the ALJ's determination by the SSA Appeals Council.  *See id.* at 232–33.  After the Appeals Council denied her request, *id.* at 1–6, Yarnal initiated this action for review under 42 U.S.C. §§ 405(g) and 1383(c)(3).

### 1.  The Hearing

The ALJ conducted a hearing on May 6, 2016.  *See id.* at 38–104.  Two witnesses testified: Yarnal and vocational expert Gerald Belchick (the "VE").  *See id.* at 39.

#### a.  Yarnal's Testimony

At the hearing, Yarnal testified about the demands of her past work.  With respect to her job as a furniture restorer, between 1985 and 2002, she testified that on average this job required her to sit for two hours while completing paperwork, to walk for two hours, and to stand for four hours while repairing furniture, which included stripping off old finish or burns, sanding, and staining the furniture.  *Id.* at 65–67, 69, 82.  The physical demands of this job also required Yarnal to occasionally lift up to 100 pounds and to frequently lift 25 pounds.  *Id.* at 66; *see also id.* at 88.

Yarnal testified that in her subsequent job as a "retail sales consultant" she helped buy and sell merchandise and complete the physical work to ready the store for its opening.  *Id.* at 63.  Yarnal testified that this role required "a lot of climbing on ladders and painting," as well as moving display work, window coverings, and furniture such as beds and dressers.  *Id.* at 65, 96.  Yarnal testified that she frequently lifted 50 pounds in this retail environment because the store received new stock every day.  *Id.* at 64.  Yarnal estimated that at this job she averaged six hours of physical labor, one hour sitting, and one hour standing each day.  *Id.* at 65.

In her work at the bridal shop, which she began in 2005, Yarnal worked both as a saleswoman, and later, the store manager.  *Id.* at 56–57.  Yarnal testified that this job required her to not only lift, move around, and repack boxes of wedding dresses that weighed 100 pounds or more, and to frequently lift 25 to 50 pounds, *id.* at 60–61, 87, but also to carry dresses overhead and to reach up for a high rack above her head, *id.* at 83–84.  Yarnal testified that she could carry

three to four dresses when she started working in the shop, *id.* at 83, but that years later she could only carry and hang up one dress at a time. *Id.* at 84. Yarnal testified that she had additional responsibilities as the lead worker and store manager, including hiring new employees in conjunction with the store owner. *Id.* at 60–61. Yarnal testified that this job required an average of three hours walking, two hours standing, one hour kneeling, and one hour sitting each day. *Id.* at 57, 61.

Yarnal testified that she was laid off at the bridal store on June 8, 2012 in part because she was less and less able to kneel, bend, stoop down, and get back up from the concrete floors. *Id.* at 56–57. In addition, the bridal store had two flights of stairs and Yarnal struggled to constantly move wedding dresses, lift and carry stock, and stock shelves as required in the job. *Id.* at 56. Yarnal also lost her job in part because the owner downsized from two stores to one. *Id.* at 57. Yarnal testified that when the owner closed the other store she returned to the store that Yarnal had been running and no longer needed Yarnal. *Id.* at 57.

Yarnal testified that she spent the next year searching for work, but that she was unable to find a job she could perform because the inflammation in her knees continued to get worse. *Id.* at 62. Yarnal testified that she stopped collecting unemployment in April 2013 but she did not stop looking for jobs until she had knee surgery in June of 2013. *Id.* at 62–64.

Yarnal testified that she is unable to work because of the osteoarthritis in both of her knees. *Id.* at 70. She also testified that she would need knee surgery in the future, because Dr. Moskovitz had told her after he performed her first knee surgery that she would need it in one to four years depending on her level of activity, and that they would revisit it in six months and a year. *Id.* at 70–72. Yarnal testified that "Kaiser" "want[ed] [her knees] to be worse than what they are right now because knee replacements only last a certain amount of time, given [her] age." *Id.* at 71.

Yarnal also described her knee pain and stated that she now walks very slowly because even walking at a normal pace makes her feel like her "knees are going to blow up." *Id.* at 72. She testified that "kneeling, stooping, bending, [and] climbing," are all "problematic" for her and that she must take opioids every day for the pain. *Id.* at 72. In addition, she is very sleep deprived because of the pain in her knees at night. *Id.* at 76. Yarnal also testified that she has "venous

insufficiency that makes [her] legs ache . . . from standing so much," and that although she has had restless leg syndrome her entire life, the condition has gotten worse as she has aged. *Id.* at 72–73.

Yarnal testified that she takes a lot of medication for these health issues, including Norco for her knees and methadone and clonazepam for her restless legs, but that while the medications "make[] it tolerable to like a pain level of seven," the medications make her "foggy," so she often loses her train of thought and struggles with numbers and calendar dates. *Id.* at 73, 75. She testified that because of these medications she could not go back to working at a retail store which would require her to deal with numbers, ordering, and scheduling. *Id.* at 75. Yarnal added that she cannot even keep her own schedule. *Id.* at 75.

Yarnal testified that five years ago she began suffering from arthritis in her hands, and within the past two years, painful nodules also appeared on the back of her hands. *Id.* at 50–51. In addition, Yarnal testified that she has trigger fingers in both hands which means that her "fingers lock and get stuck," and she must force them open. *Id.* at 85. Because of these hand issues and the weakness in her left arm after having shoulder surgery, Yarnal also has trouble closing her fists, gripping, and picking up or carrying even small or light items. *Id.* at 50–51, 72.

Yarnal lives with her husband, two of her sons, her daughter-in-law, and her two youngest grandchildren, who are three and eight years old. *Id.* at 53. She is 5'4" and weighs 255 pounds. *Id.* at 54. Yarnal testified that she usually drives once a week to the grocery store, *id.* at 54–55, but she cannot run after her grandchildren or do anything that requires her to stand for a long time. However, Yarnal is able to play with her grandchildren from a sitting position. *Id.* at 53–54.

With respect to her other daily activities, Yarnal testified that she can perform light household chores, such as gardening or washing dishes, when done in 15-minute blocks followed by 15- to 30-minute rest breaks where she can sit down with her legs up or straight out on another chair. *Id.* at 80–81. She testified that if she does not pace herself in this manner she will "set off the pain real bad." *Id.* at 81. Yarnal testified that she has a small vegetable garden and a few flower pots that are planted in straw bales above ground rather than in dirt because she "can't bend over and squat down." *Id.* at 78–79. She testified that every member of the household helps with

the garden and that she only waters and picks tomatoes. *Id.* at 80.

### b. Vocational Expert Gerald Belchick's Testimony

The VE offered testimony regarding the exertional levels Yarnal's past work after asking Yarnal to clarify how much weight she had lifted in her prior jobs. *Id.* at 87. Yarnal testified that she lifted 50 pounds "quite often" at the bridal shop, *id.* at 87, and she occasionally lifted 100 pounds or more in two of her jobs (at the bridal shop and when she worked in furniture repair), *id.* at 87–88. *Id.* at 88–94. With that additional testimony, the VE testified that Yarnal's job in the bridal shop constituted a semiskilled occupation with a specific vocational preparation ("SVP") value of 3 and while such a job is classified as "light" exertion level in the Dictional of Occupational Titles ("DOT"), it should be classified as heavy as performed by Yarnal because she lifted over 50 pounds. *Id.* at 88. Similarly, the VE testified that the job of a bridal shop manager would generally be considered a skilled occupation, SVP 7, at a light exertion level, but it rose to the heavy level on occasion as Yarnal performed it. *Id.* at 89, 94. The VE testified that Yarnal's furniture repair job was a SVP 4 classification requiring a medium level of exertion. *Id.* at 92. With respect to Yarnal's mixed role as a consultant, the VE opined that her job would be classified at a "medium or perhaps heavy" level of exertion. *Id.* at 96–97.

The ALJ next posed a series of hypotheticals to the VE. First, the ALJ asked the VE if an "individual of [Yarnal]'s age and education and with the past jobs" described, and "limited to light work as defined in the regulations, except" that the job requires the individual to "frequent[ly] overhead reach" and "occasional[ly] push-pull with [the] left, non-dominant upper extremity," and to "occasional[ly] balance, stoop, kneel, crouch, crawl, and climb ramps and stairs," but requires "no exposure to high exposed places or moving mechanical parts," could perform any of the past jobs described either as Yarnal "actually performed [it] or as generally performed in the national economy." *Id.* at 98. The VE responded that such a person could do the sales and managerial jobs as generally performed, but "not as [Yarnal] performed it." *Id.* at 98. The VE further opined that the person could not do the furniture repair job "because there are restrictions on pushing and pulling and so on." *Id.* at 98.

The ALJ then asked:

15

> [I]f that hypothetical individual was further limited to no kneeling, crawling, or climbing ramps and stairs; and occasional overhead reach with the left, non-dominant upper extremity; frequent handle, finger, and feel, and no extreme cold, could that hypothetical individual perform any of the past jobs you described?

*Id.* at 98–99. The VE responded that the person could perform the same two jobs. *Id.* at 99.

As a third hypothetical, the ALJ asked:

> What happens if that hypothetical individual could only stand and walk four hours in an eight-hour work day, and would need an option to alternate to sitting for 15 to 30 minutes after every 15 to 30 minutes of standing or walking? Can that hypothetical individual perform any of those past jobs you described?

*Id.* at 99. The VE responded that the person could perform "[n]one of her past jobs" and "none of the jobs that I mentioned." *Id.* at 99. The VE then elaborated that for "light work, she has to be able to stand and walk at least six hours out of an eight-hour day." *Id.* at 99. If she is "restricted to four hours with the additional breaks you talked about," the VE testified, "then that would eliminate the jobs that I mentioned and her past work and all other work." *Id.* at 99; *see also id.* at 100 ("[M]y experience has taught be that if you're going to do light work, you're going to have to be able to stand and walk the majority of the work day.").

Yarnal's counsel asked the VE to add a limitation that the person "could only occasionally grasp with either hand," to the ALJ's hypothetical, and asked if that person would be able to do either the sales or manager jobs. *Id.* at 101. The VE responded that she would not. *Id.* at 101. Both are "bimanual jobs," the VE explained, "so if they're restricted in reaching, handling, and fingering, which is the three upper extremity activities that we're talking about, then they couldn't do that job, no, not at all." *Id.* at 101.

### 2. The ALJ's Decision

Employing the five-step evaluation process as follows, the ALJ found that Yarnal had "not been under a disability within the meaning of the Social Security Act from June 9, 2013, through" September 29, 2016 (the date of the ALJ's decision). AR at 20–33.

At step one, the ALJ found that the record did not support a finding that Yarnal engaged in substantial gainful activity since the alleged onset date of June 9, 2013. *Id.* at 22. The ALJ also found that Yarnal met "the insured status requirements of the Social Security Act through

December 31, 2017." *Id.* at 22.

At step two, the ALJ found that Yarnal had the following severe impairments: (1) obesity; (2) osteoarthritis; (3) history of left shoulder arthroscopy; (4) right knee meniscus derangement status-post arthroscopy; (5) degenerative disc disease of the cervical spine; (6) and varicose veins. *Id.* at 22. The ALJ found that these impairments caused more than minimal limitations to Yarnal's ability to perform basic work activities. *Id.* at 22. In contrast, the ALJ found that "the medical and other evidence establish[ed] that Yarnal's [other] medically determinable impairment[s]," including, hypertension, history of thyroid surgery, restless leg syndrome, history of carpal tunnel surgery, and benign breast cysts, were non-severe. *Id.* at 23–24. The ALJ further found that Yarnal's "affective disorder does not cause more than minimal limitation in [Yarnal's] ability to perform basic mental work activities and is therefore non-severe." *Id.* at 24. In reaching this conclusion, the ALJ specifically addressed the four broad functional areas—activities of daily living, social functioning, concentration, and episodes of decompensation—under Paragraphs B and C of the mental impairment analysis set forth in section 12.00C of the Listing of Impairments, 20 C.F.R., Part 404, Subpart P, App. 1. *Id.* at 24–25.

At step three, the ALJ determined that Yarnal's impairments did not meet or medically equal the severity of an impairment listed in the Commissioner's regulations when considered either separately or in combination. *Id.* at 26. The ALJ specifically considered two medical listings. *Id.* at 26. First, the ALJ found that, "the evidence does not demonstrate that [Yarnal] has the degree of difficulty in performing fine and gross movements" or "the degree of difficulty in ambulating" as required under listing 1.02 for major dysfunction of a joint.[3] *Id.* at 26. Second, the

---

[3] Listing 1.02 is for major dysfunction of a joint (or joints) and is described as follows:

Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

ALJ concluded that the record did not "establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04," or "that [Yarnal]'s back disorder ha[d] resulted in an inability to ambulate effectively." *Id.* at 26. The ALJ concluded by stating that "although there is no specific medical listing regarding obesity," pursuant to the guidelines set forth in SSR 02-1p she had "fully considered obesity in the context of the overall record evidence in making this decision." *Id.* at 26.

At step four, the ALJ found that Yarnal had the RFC to perform light work with the following exceptions:

> she can occasionally push/pull with her left, non-dominant upper extremity[,] . . . occasionally balance, stoop, and crouch, [but] [s]he cannot kneel, crawl, or climb ramps, stairs, ladders, ropes, and scaffolds. She cannot have exposure to high, exposed places or moving mechanical parts. She can occasionally reach overhead with her left, non-dominant, upper extremity. She can frequently handle, finger, and feel. [Yarnal] cannot be exposed to extreme cold.

*Id.* at 27.

In determining Yarnal's RFC, the ALJ applied a two-step process, first considering whether the objective medical evidence established that Yarnal had underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms she complained of and next addressing the "intensity, persistence and limiting effects" of her symptoms to determine the extent to which they limited her functioning. AR 27. The ALJ concluded that Yarnal's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that Yarnal's statements regarding the intensity, persistence and limiting effects of her symptoms were exaggerated. AR 30-31. The ALJ's conclusion was based on the "objective medical evidence" and inconsistent statements by Yarnal about her daily activities that led the ALJ to believe that information provided by Yarnal was not "entirely reliable." AR 31.

---

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.02.

At step 5, the ALJ found that Yarnal's jobs as a salesperson at a bridal shop and as a refinisher qualified as past relevant work. AR 32. She further concluded that Yarnal was "capable of performing past relevant work as a salesperson . . . and manager [at a] bridal shop" as that job is generally performed in the national economy. The ALJ acknowledged that Yarnal's limitation to occasional reaching overhead is not consistent with the limitations for this job described in the Dictionary of Occupational Titles (("DOT"), which describes the job as involving *frequent* overhead reaching, but relied on the VE's testimony, based on his experience, that the job could be performed by someone who could only reach occasionally. AR 32.

### D. Contentions of the Parties

#### 1. Plaintiff's Motion for Summary Judgment

In her Motion for Summary Judgment, Yarnal contends the ALJ erred by failing to provide specific, clear, and convincing reasons for rejecting her testimony about the severity of her symptoms. Plaintiff's Motion for Summary Judgment at 6-7. According to Yarnal, the ALJ articulated "essentially" four reasons for discrediting her testimony, all of which fall short: "1) [l]ack of objective support; 20 [h]istory of medical treatment[;] 3) [d]aily activities; and 4) [n]eed for additional surgery on the knee." *Id.* at 8.

With respect to the need for additional knee surgery, Yarnal points to a colloquy with the ALJ at the hearing in which the ALJ suggested that Yarnal's testimony was inconsistent with the medical record with respect to when she was likely to need knee replacement surgery. *Id.* at 8-9 (citing AR 70-71). Yarnal argues that her testimony was consistent with the medical record and in particular, the records of Dr. Gansel on this question, and that the ALJ's reliance on an alleged inconsistency was not a clear and convincing reason for discounting Yarnal's testimony about the severity of her symptoms. *Id.* at 10. Yarnal further asserts that the ALJ's reliance on her daily activities also does not meet this standard because she did not point to any specific activity or explain how it was inconsistent with Yarnal's claimed limitations. *Id.* Yarnal argues that the ALJ's reliance on the medical record also was misplaced because her "level of treatment was not conservative nor inconsistent with the level of pain and limitation alleged." *Id.* at 10. Finally, to the extent the ALJ suggests in her decision that as to some of her symptoms there was no

underlying objective evidence to support her claims, Yarnal argues that these findings are contradicted by the record, which is "replete" with such evidence. Id. at 11.

Yarnal argues that the proper remedy in this case is to reverse the decision of the Commissioner under the credit-as-true rule because the ALJ should have credited Yarnal's testimony about her limited ability to stand and walk. *Id*. at 12. Because the VE testified that in light work would require a claimant "to be able to stand and walk the majority of the work day," Yarnal asserts, the evidence in the record is sufficient to establish that she is disabled and no further proceedings are appropriate. *Id*. (citing AR 100).

### 2. Defendant's Motion for Summary Judgment

The Commissioner responds that the ALJ properly discounted Yarnal's subjective allegations. Defendant's Motion for Summary Judgment at 3–11. The Commissioner argues that the ALJ identified several permissible factors in assessing Yarnal's credibility, chief among them, "that the objective evidence undercut the persuasiveness of [Yarnal]'s allegations." *Id.* at 4. The Commissioner argues that the ALJ reasonably discounted Yarnal's claims about her ability to walk or stand for prolonged periods based on the treatment and imaging records from multiple doctors. *Id.* at 5–6.

The Commissioner also argues that the ALJ correctly found Yarnal's testimony regarding her necessity for knee surgery inconsistent with the record because Yarnal initially "testified that she could not work because '[her] knees need to be replaced,'" and then "eventually . . . agreed that she did not currently need knee replacement" after "the ALJ pointed out evidence to the contrary." *Id.* at 6. The Commissioner adds that even if the ALJ erred in this regard, the error is harmless because the rest of the ALJ's reasoning still survives. *Id.* at 6.

The Commissioner argues that Yarnal's testimony concerning her hand impairments was also inconsistent with the findings of objective physical examinations, imaging, and doctor recommendations. *Id.* at 6. Similarly, the Commissioner asserts, the ALJ pointed to findings from Yarnal's spinal x-rays in support of her conclusion regarding the severity of Yarnal's symptoms. *Id.* at 7. In addition, the Commissioner argues that the ALJ properly considered the "improvement in Yarnal's left shoulder as evidence that Plaintiff's upper extremities were not as limited as she

claimed." *Id.* Likewise, the Commissioner argues that "[m]edical improvement after arthroscopy of the right knee was also a legitimate reason the ALJ cited for finding Plaintiff not disabled." *Id.* at 9. The Commissioner also contends that the ALJ reasonably found that Yarnal's treatment history undermined her allegations because the findings from Drs. Burt, Benrazavi, and Gong do not corroborate her claims that she needs to rest after walking two blocks, that she can only sit for 15-30 minutes, and that she can only lift 5-10 pounds. *Id.* at 9.

Turning to Yarnal's daily activities, the Commissioner acknowledges that "the ALJ did not discuss specific inconsistent daily activities compared to specific testimony" when reasoning that Yarnal's claims were inconsistent with the evidence. *Id.* at 10. However, the Commissioner argues that "elsewhere" in her decision the ALJ pointed to specific facts that undermine Yarnal's credibility, such as Yarnal's testimony that she could could cook small meals and complete simple chores like washing dishes, grocery shopping, and laundry, which are inconsistent with Yarnal's claims about her limited ability to sit, stand, and walk, the Commissioner contends. *Id.* at 10.

Finally, the Commissioner contends that the "ALJ also pointed out that Yarnal did not stop working at the bridal shop because of medical problems, but because she was laid off." *Id.* at 10 (citing AR at 24). As Yarnal was working at the heavy level of exertion at the time she was laid off, the Commissioner asserts, this evidence also is inconsistent with Yarnal's allegations as to the severity of her limitations and supports the ALJ's conclusion on that issue. *Id.* at 11.

The Commissioner concludes that "the ALJ provided a sufficient basis to determine that she did not arbitrarily reject [Yarnal]'s testimony" and the decision should be affirmed. *Id.* at 11. The Commissioner argues further that even if the Court finds that the ALJ erred, the proper remedy is to remand for further proceedings rather than for award of benefits. *Id.* at 11–13.

## III.    ANALYSIS

### A.    Legal Standard Under 42 U.S.C. §§ 405(g) and 1383(c)(3)

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a denial of

benefits only if it is not supported by substantial evidence or if it is based on legal error." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)) (quotation marks omitted). Substantial evidence must be based on the record as a whole and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "must be 'more than a mere scintilla,' but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). Even if the Commissioner's findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

The Court must review the record as a whole, considering the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Reviewing courts "are constrained to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the ALJ's decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

### B. The ALJ Improperly Rejected Yarnal's Testimony

#### 1. Legal Standard for Reviewing Claimant Credibility Findings

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). "The ALJ's findings, however, must be supported by specific, cogent reasons." *Id.* An ALJ must engage in a two-step analysis to properly assess the credibility of a claimant's testimony.

United States District Court
Northern District of California

*Garrison*, 759 F.3d at 1014. First, the ALJ determines whether a claimant presented objective medical evidence of an impairment that could reasonably be expected to produce the alleged pain and symptoms. *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (2007)). If the first step is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony by providing specific, clear, and convincing reasons for determining that it lacks credibility. *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281; *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)). "General findings are insufficient." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (as amended 1996)). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*

Furthermore, once a claimant satisfies the first requirement of the two-part test, the ALJ "may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester*, 81 F.3d at 834; *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) ("[A]n ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."). Although "[a]n ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment . . . when a medical impairment has been established," the ALJ cannot reject the claimant's testimony without providing "specific, cogent reasons for the disbelief." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citations omitted). "The ALJ must cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* (alterations in original; citations omitted). Where the ALJ does not find affirmative evidence that the claimant was a malingerer, the reasons for rejecting the claimant's testimony must be clear and convincing. *Id.* The Ninth Circuit has stated that "[t]he clear and convincing standard is the most demanding required in Social Security cases." *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

> **2. At the first step of the two-part test, the ALJ erred to the extent that she found that some of Yarnal's allegations were not supported by any objective medical evidence**

Although the ALJ found that "the claimant's medically determinable impairments could

23

reasonably be expected to cause the alleged symptoms," she also found both that "the alleged severity of the claimant's workplace limitations are not supported by the objective medical record as a whole" *and* that "the claimant has multiple subjective complaints of pain without the corresponding objective etiology or findings to support her allegations." AR at 29. In other words, it appears that the ALJ found that *some* of Yarnal's allegations were supported by objective medical evidence of an impairment that could reasonably be expected to produce the alleged pain and symptoms whereas others were not.

In the brief discussion that follows, the ALJ discusses Yarnal's osteoarthritis in her hands, the thickness tear and arthroscopy of her left shoulder, the results of a cervical spine x-ray, and the osteoarthritis and arthroscopy of her knees. AR at 29-30. As the impairments the ALJ specifically discusses in this paragraph are also the impairments that she found to be severe, the sentence quoted above leaves the Court to guess what allegations the ALJ dismissed on the basis that there was *no* objective medical evidence to support them. To the extent her credibility finding is based, in part, on her conclusion that some of Yarnal's allegations are supported by no objective medical evidence, the ALJ had an obligation to explain what allegations she was rejecting on that basis and in failing to provide any such explanation she committed legal error. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence.").

### 3. At the second step of the credibility analysis, the ALJ did not provide clear and convincing reasons for declining to fully credit Yarnal's allegations as to the severity of her symptoms

To the extent the ALJ found that some of Yarnal allegations *were* supported by objective medical evidence of impairments that could have caused her symptoms, and in light of the fact that the ALJ did not find that Yarnal was malingering, the ALJ was required to provide clear and convincing reasons for her failure to fully credit Yarnal's allegations with respect to the "intensity, persistence and limiting effects" of her symptoms. The Court concludes that the ALJ did not meet this standard.

a. Yarnal's inconsistent testimony is not a clear and convincing reason for rejecting her allegations as to the severity of her symptoms

    i. Background

In her decision, ALJ Kolikowski states that Yarnal's "allegations are weakened by inconsistencies between her allegations, her statements regarding daily activities, and the medical evidence." AR 31. The only specific inconsistency the ALJ identifies in her written decision is that "although the claimant testified at the hearing that she needs surgery on her knee, her own treating physician indicated that her osteoarthritis had not progress far enough to warrant surgery. AR 30 (citing treatment notes of Dr. Gansel dated March 30, 2015 at AR 1170-1171). In connection with this conclusion, the ALJ questioned Yarnal at the hearing as follows:

> A: The reasons I feel like I can't work right now is that I have osteoarthritis in both knees. My knees need to be replaced, both knees.
>
> . . .
>
> Q: I want to just ask you something because actually, in the record, I saw when you recently went to the orthopedic doctor, that . . . Gansel [sic] said that you actually weren't ready for a knee replacement yet.
>
> A: Not yet.
>
> Q: Okay . . . All right. So I wanted to check because some places in the record where you say that, but the doctor is saying something a little bit different than what you're saying.
>
> A: Yeah. What he had -- okay. Moskovitz . . . was my first doctor. And what he said was that I needed it between one and four years, I would need my knees done. And he goes, and that depends on what you do. He goes, if you're very light duty you know, not much, you'll extend it. They wanted me to extend it as long as possible. This is what he told me.
>
> Q: Okay. And do you remember when he said that?
>
> A: Right after the first knee surgery.
>
> Q: Okay.
>
> A: He has since retired.
>
> Q: Right. But we should have the records.
>
> A: Yeah.
>
> Q: So I didn't look -- I was -- I usually start with the more recent records first –

25

1    A: Yeah.

2    Q: -- to see how people are doing now.

3    A: And so the last time I talked to Gansel, Dr. Gansel [sic], he said—
     he goes, they haven't changed enough for Kaiser. They want it to be
4    worse than what they are right now because knee replacements only
     last a certain amount of time, given my age, and --
5
     Q: Right.
6
     A: -- they don't want to do it a second time.
7
     Q: Right, right
8
     A: So the longer they extend, then they're happier.
9
     Q: Okay. So I want to just clarify because that was my take with that,
10   they were saying at this time, but in the future likely.

11   A: Yeah.

12   Q: That was my take of what the record said, okay.

13   A: So -- and it's -- the last time we talked -- and I don't know what
     he wrote, but the last time we talked, he told me, you know, we'll
14   revisit six month and at a year, and see where [we]'re at.

15   AR at 70–72.

16       The administrative record reflects that after Yarnal's knee surgery, in June 2013, Dr.

17   Moskovitz told her that she would likely need knee replacement in one to five years and that he

18   "suspected" she would need to have her knees replaced in one to two years.  AR 742.  A note from

19   a June 21, 2013 post-operative note lists findings of "[t]orn medial and lateral menisci, gr 3, 2-3

20   PF."  AR 675.

21       Dr. Gansel stated in the report cited by ALJ Krolikowski, dated March 30, 2015, that "knee

22   arthritis is not progressed yet to the point of knee replacement so recheck prn."  AR at 1171.  In

23   addition, as discussed above, Dr. Gansel explained to Yarnal almost a year earlier, on May 6,

24   2014, the significance of Dr. Moskovitz's post-operative note that Yarnal's knees were at Stage 3.

25   AR at 994.  Dr. Gansel told Yarnal that she "needed to be ready to have [her] knees replaced"

26   before they reached stage four, recommending that she have "repeat standing x-rays" to monitor

27   the progress of her arthritis.  AR at 994.  Consistent with that recommendation, he referred Yarnal

28   for x-rays of both knees at that time.  *Id.*

26

In a disability report completed by Yarnal on May 22, 2014, her response to a question about the treatment she received for her knee pain and derangement of meniscus of knee states, in part, as follows:  "After surgery Dr. Moskovitz told me that both knees were at a stage 3+ and would need replacements in both in 1- to 4 years [.]" AR at 252.

## ii.  Discussion

Having reviewed the evidence in the record concerning Yarnal's need for knee replacements, the Court finds that Yarnal's testimony was consistent with the medical evidence in the record.  In her disability report, she stated that she had been told by Dr. Moskovitz that she would need knee replacement surgery in one to five years and her medical records reflect that Dr. Moskovitz told her she was likely to need knee replacement surgery in as little as one to two years. At the hearing, Yarnal testified that she had been told by Dr. Moskovitz that she would need to have her knees replaced in one to four years, confirming the ALJ's understanding that it was "likely" she would need knee replacement in the future.  The "inconsistency" that the ALJ expressed concern about was based on the March 30, 2015 report by Dr. Gansel.  That report, however, was not inconsistent with Dr. Moskovitz's statements, as he merely stated that Yarnal was not ready for knee replacements yet.  Dr. Gansel did not make any notations suggesting he disagreed with Dr. Moskovitz's opinion that Yarnal would likely need to have her knees replaced within (at most) a few years. Rather, Dr. Gansel's earlier explanation of Dr. Moskovitz's post-operative note, and his recommendation that Yarnal have regular x-rays and be prepared to have knee surgery before she reached Stage 4, are entirely consistent with both Dr. Moskovitz's opinion and Yarnal's own testimony about when she was likely to need knee surgery.

The Court further notes that ALJ Kolikowski told Yarnal at the hearing that she had not reviewed Dr. Moskovitz's medical records but had only reviewed Yarnal's more recent records. AR at 71.  Thus, it appears that her belief that Yarnal's statements were inconsistent with the medical record was at least in part a result of the fact that ALJ Krolikowski had not conducted a thorough review of the record.

The Court also rejects the Commissioner's reliance on Yarnal's statement at the hearing that her knees "need to be replaced" to show that she offered testimony that was inconsistent with

27

her doctor's advice. *See* Defendant's Summary Judgment Motion at 6. Having been told by her treating physician almost three years before the hearing that her knees would likely need to be replaced within a few years and given that this statement is ambiguous as to the time frame, it is a reach to characterize it as being inconsistent with the medical record and certainly not a clear and convincing reason for finding Yarnal's testimony to be unreliable. Moreover, it is improper to take this single statement out of context to discredit Yarnal when she accurately stated, both in her disability report and at the hearing, that her doctors had told her that she was not yet ready for knee surgery but would require knee surgery within a matter of a few years.

Because the finding of inconsistency is not supported by the record with respect to Yarnal's knee replacement surgery and the ALJ did not identify any other inconsistencies in Yarnal's testimony, the ALJ's reliance on inconsistent testimony is not a clear and convincing reason for discrediting Yarnal's allegations regarding the severity of her symptoms.

> b. Yarnal's daily activities are not a clear and convincing reason for rejecting her allegations as to the severity of her symptoms

"Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination." *Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (quoting *Light v. Soc. Sec. Admin*., 119 F.3d 789, 792 (9th Cir.1997)). Courts have repeatedly emphasized, however, that "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016. Consequently, the ALJ must identify the specific activities that are inconsistent with the claimant's allegations and findings of inconsistency are only relevant to a claimant's credibility if they are supported by substantial evidence. *Burrell*, 775 F.3d. at 1138 ("Our decisions make clear that we may not take a general finding—an unspecified conflict between Claimant's testimony about daily activities and her reports to doctors—and comb the administrative record to find specific conflicts."); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what

evidence undermines the claimant's complaints."); *Vasquez v. Astrue*, 572 F.3d 586, 592 (9th Cir. 2009) ("To support a lack of credibility finding, the ALJ was required to point to specific facts in the record. . . ."). In this case, the ALJ's decision does not meet these standards.

First, while the ALJ addresses Yarnal's activities of daily living in connection with step two of the five-part disability analysis, where she finds that Yarnal's mental impairment is not severe, *see* AR at 24, she makes only a conclusory statement at step four that her credibility finding is supported by Yarnal's daily activities; she fails to identify any specific activities that are inconsistent with Yarnal's allegations about her limitations or elaborate on the reasons why they are inconsistent with those allegations.[4] AR at 31. Indeed, the Commissioner acknowledges in her summary judgment motion that "the ALJ did not discuss specific inconsistent daily activities compared to specific testimony." Defendant's Motion for Summary Judgment at 10. Because the ALJ did not fulfill her obligation to elaborate on which daily activities conflict with Yarnal's testimony, she erred in relying on those activities to discredit Yarnal's testimony.

Second, even if the Court were to consider the ALJ's statements about Yarnal's daily activities made in her discussion at step two, those activities still do not provide substantial evidence in support of her credibility finding. None of the activities referenced by the ALJ appears to be indicative of less severe limitations than alleged by Yarnal, such as her allegation that she could not perform light work because it would require her to be on her feet for a majority of the work day. Moreover, the ALJ mischaracterizes Yarnal's activities by ignoring Yarnal's consistent testimony about her need to take frequent rest breaks and naps due to her knee pain.

---

[4] At step two, the ALJ made the following findings with respect to activities of daily living:

> In her application for disability, the claimant indicated she has difficulty reaching her shoes to tie them but otherwise could perform her own personal care. The claimant indicated prepare her own simple meals. The claimant stated she could sweep, mop, and do the dishes. The claimant reported she could do laundry three times a week. The claimant indicated she could drive a car and go out on her own. . . The claimant reported to Dr. Yee that she was able to do simple chores such as washing dishes, grocery shopping, and laundry. She indicated she could dress and bathe herself.

AR at 24.

See AR at 80-81 (testimony that she can complete light household chores only in 15-minute increments and then she requires 15 to 30-minute rest breaks sitting down either with her legs up or straight out on another chair and that if she does not "pace" herself in this manner then she will "set off the pain real bad."); 54 ("Pacing, nothing that requires standing for a long period of time."); 80 ("But again, it's pacing . . . If I do the dishes, then it's work on it and then go sit down."); 80-81 (testimony that Yarnal naps every day in the afternoon because her knee pain keeps her up at night). For these reasons, the ALJ erred in relying on Yarnal's daily activities as a reason to discredit her testimony. *See Garrison,* 759 F.3d at 1016 (finding that ALJ erred in relying on the claimaint's activities of daily living in support of credibility finding because the ALJ mischaracterized the claimant's testimony as to the nature of those activities and also erred "in finding that these activities, if performed in the manner that [the claimant] described, are inconsistent with the pain-related impairments that [the claimant] described in her testimony.").

c.  Yarnal's treatment history and medical records are not a clear and convincing reason for rejecting Yarnal's allegations as to the severity of her symptoms

Finally, the ALJ based her credibility finding on Yarnal's history of treatment and medical record, which she found did not fully support Yarnal's allegations with respect to the severity of her limitations. The Court finds that in reaching this conclusion, the ALJ gave insufficient weight to the opinions of Yarnal's treating and examining physicians and that her conclusion is not supported by substantial evidence.

First, with respect to Yarnal's hand impairment, the ALJ stated in connection with her credibility finding that "imaging of the claimant's hands revealed osteoarthritis," but that a subsequent examination "revealed she had normal motor strength." AR at 29 (citing AR at 1144, 1222). However, this subsequent examination was conducted by Dr. Gong, Yarnal's neurologist, during a neurology clinic follow up primarily focused on discussing her medications to address Yarnal's restless leg syndrome. *See* AR at 1221–25. Even assuming that Dr. Gong conducted a thorough examination of Yarnal's hands, the ALJ does not explain why a finding of normal motor strength is inconsistent with Yarnal's complaints of severe pain in her hands or her testimony that she cannot pick up small objects. *See, e.g.,* AR at 51, 1141. Furthermore, the ALJ failed to

address the diagnosis of treating physician Moskovitz that she also was experiencing triggering of her second through fourth fingers of both hands. AR 674. As a treating physician, Moskovitz's opinion is entitled to great weight and where, as here, there is no conflicting opinion by another medical provider, the ALJ could only disregard it if she had clear and convincing reasons for doing so. *Lester v. Chater*, 81 F.3d at 830. Yet the ALJ simply ignored this evidence.

The ALJ's consideration of the medical record with respect to Yarnal's knee pain is also deeply flawed. The ALJ states in connection with her credibility finding that "[w]hile imaging of the claimant's knees revealed she has bilateral osteoarthritis, objective physical examinations of the claimant's knees after arthroscopic surgery revealed only minimal restricted range of motion and minimal restrictions on flexion and extension." AR 30 (citing AR 1112-1113, 1145). The ALJ's conclusion is also based on her finding that Dr. Burt's evaluation of Yarnal's limitations was entitled to "little weight" because he did not "review any objective radiology evidence but rather relied on the claimant's subjective reports about what he [sic] x-rays and MRIs revealed." AR 30. The ALJ further found that Yarnal "over reported the severity of her impairments by informing Dr. Burt that she needed a knee replacement which her own treating doctor indicated she did not need such a procedure." *Id.*

These reasons for rejecting Yarnal's allegations as to the severity of her limitations resulting from her knee pain are not "clear and convincing." First, the ALJ's treatment of the opinions of Dr. Burt, an examining doctor, was improper. The ALJ suggests that because of a notation that he did not have any actual x-rays to review, *see* AR at 1034 ("no films were available for review"), he based his opinions on Yarnal's description of her past treatment. That is inaccurate, as is apparent from even a cursory review of Dr. Burt's report. Dr. Burt states that he reviewed a "massive Kaiser Permanente file," including the records of Dr. Moskovitz and Dr. Gansel (among many others), and the results of both MRIs and x-rays. AR at 1031-1033. There is no suggestion anywhere in his report that he relied on Yarnal's description of what the x-rays and MRIs revealed as opposed to the doctors' reports describing the MRIs and x-ray that were contained in the medical records Dr. Burt reviewed.

ALJ Krowlikowski also mischaracterizes the record when she states that Yarnal "over

reported the severity of her impairments" by telling Dr. Burt her doctor had told her she needed

knee replacement surgery whereas the report of Dr. Gansel showed that she did not.  As discussed

above, Yarnal has consistently said that Dr. Moskovitz told her she would need knee replacement

surgery within one to five years – a representation that is entirely consistent with the medical

record (including the reports of Dr. Gansel).  Likewise, Dr. Burt's report reflects that Yarnal told

him that "[s]he was told that she would need bilateral total knee replacements within one year to

five years after the right knee procedure, which was done in June of 2013."  AR at 1030.  Further,

while Dr. Burt also states that Yarnal told him that "she was told once again that she would [need]

total knee replacements" by Dr. Gansel, there is nothing to suggest that Yarnal misled him as to

*when* she would need that surgery and in any event, Dr. Burt specifically states in his report that

he reviewed Dr. Gansel's treatment notes.  *See* AR at 1033.  As discussed above, Dr. Gansel's

notes are not inconsistent with Dr. Moskovitz's opinion that Yarnal would likely need knee

replacement surgery within a few years. ALJ Krolikowski has simply manufactured an

inconsistency that does not exist.

Finally, while the ALJ found that the medical record reflects only minimal restrictions on

Yarnal's range of motion, flexion and extension, she does not explain why these findings are

inconsistent with Yarnal's testimony about the severity of her knee pain or the associated

limitations.  Indeed, Dr. Burt's examination revealed that Yarnal's flexion and range of motion as

to her knee joints was relatively good, *see* AR at 1034, yet he nonetheless found that her knee pain

resulted in significant limitations with respect to the length of time she could remain on her feet,

the distance she could walk, and various postural limitations.  AR 1035.[5]  Similarly, the treatment

note by Dr. Singh (a treating physician) that the ALJ cites in support of her credibility finding

reflects that Yarnal experienced "*mild pain* at extremes of flexion/extension."  AR at 1113

---

[5] The ALJ's decision to give little weight to Dr. Burt's opinion is particularly likely to have
resulted in prejudice to Yarnal because it was the most up-to-date and comprehensive evaluation
of Yarnal's restrictions related to her lower extremities at the time of the hearing.  The ALJ gave
only partial weight to the opinions of Dr. Moskovitz as to the severity of her limitations because
"Dr. Moskovitz opined the claimant had these restrictions just six months after her surgery" and
therefore those restrictions were not "current" or "permanent." AR at 30.  Dr. Burt's examination,
in contrast, was conducted more than two years *after* Yarnal's surgery and he opined that her knee
symptoms were "permanent and stable."  AR at 1035.

(emphasis added). In other words, the medical record does not support the implicit conclusion of the ALJ that evidence of limited restrictions on range of motion and flexion meant that Yarnal's knee pain was not as severe as Yarnal alleged.

In sum, the Court finds that the ALJ's reliance on the medical record and Yarnal's treatment history is not a clear and convincing reason for finding that her allegations regarding the severity of her symptoms were not fully credible.

### C.     Remedy

The Court finds that the ALJ's reasons for rejecting Yarnal's allegations were flawed for the reasons discussed above. Therefore, the Court reverses the ALJ's decision. The Court further finds, however, that even if Yarnal's testimony about the severity of her limitations is credited, further proceedings are necessary to determine whether she is disabled.

First, the ALJ addressed only whether Yarnal could do past relevant work at step five and did not reach the question of whether Yarnal might be able to perform other work available in the national economy even if she could not perform past relevant work. As it is possible such work might be available even if Yarnal's RFC was more restrictive, the Court concludes that application of the credit-as-true rule to award benefits is not appropriate in this case. *See Garrison*, 759 F.3d at 1019–21 (holding that it is appropriate to remand for award of benefits only where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."). Rather, the Court concludes that further proceedings are required at both step four (to determine Yarnal's RFC based on the application of proper legal standards)[6] and at step five (to determine whether there are jobs available for a person of Yarnal's age, educational background and RFC).

In addition, the Court concludes that the errors discussed above may have implications for

---

[6] In conducting this review, the Commissioner should conduct a complete assessment of the record and should not limit further proceedings to addressing the specific flaws discussed above with respect to the ALJ's evaluation of Yarnal's limitations.

the ALJ's conclusion at step three that Yarnal did not meet any Listing.  In particular, the ALJ found that Yarnal did not meet Listing 1.02 because she did not have the required degree of difficulty with respect to fine and gross movements and ambulation. *See* AR at 26.   The ALJ's errors, including her errors in evaluating the opinions of Dr. Burt and Dr. Moskovitz, cast her conclusion into doubt on this question.  While the Court does not find that the record is sufficient to establish without further proceedings that Yarnal is disabled under a Listing, the Commissioner should revisit the question of whether Yarnal meets any Listing upon remand.

## IV.     CONCLUSION

For the reasons stated above, the Court GRANTS Yarnal's Motion for Summary Judgment, DENIES Defendant's Motion for Summary Judgment, REVERSES the decision of the Commissioner, and REMANDS the case to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated:  March 27, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge